2020 IL App (1st) 181466-U

SIXTH DIVISION
October 16, 2020

No. 1-18-1466

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of Cook County. |
| | ) | |
| v. | ) | 15 CR 03356 01 |
| | ) | |
| WILLIE MIMS, | ) | Honorable Thaddeus L. Wilson, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE CONNORS delivered the judgment of the court.
Justices Harris and Griffin concurred in the judgment.

**ORDER**

¶ 1    *Held:*   The trial court failed to conduct a preliminary *Krankel* inquiry after defendant's *pro se* allegations of ineffective assistance of trial counsel. This did not constitute harmless error, and the case must be remanded.

¶ 2    Following a bench trial, defendant, Willie Mims, was convicted of first degree murder and aggravated discharge of a firearm in connection with the shooting death of Dearies Arnold, and was sentenced to consecutive prison terms of 70 and 10 years. On appeal, defendant contends that the trial court failed to conduct a preliminary inquiry into his *pro se* posttrial claims of ineffective assistance of trial counsel, as required by *People v. Krankel*, 102 Ill. 2d 181

(1984). For the following reasons, we remand for the trial court to conduct a preliminary inquiry into defendant's *pro se* claims of ineffective assistance of counsel.

¶ 3                                    I. BACKGROUND

¶ 4      At defendant's bench trial, he was represented by assistant public defender Margaret Domin. During the pretrial proceedings, defendant asked the trial judge to appoint him a different attorney other than Domin. The court stated that it would not appoint him a different attorney, but that he could proceed *pro se*. Two weeks later, defendant requested Domin to be reappointed as his counsel.

¶ 5      At trial, Steven Smith testified that on the night in question, August 11, 2014, he was at 7158 South Green Street in Chicago with the victim, who was his good friend that he grew up with. Smith testified that there were other people in the area. Shortly before 7 p.m., when it was still light out, he was sitting on a stoop in front of the apartment building when a black van with a grey stripe on the bottom pulled up. The van stopped in front of Smith and the victim. Smith saw the driver and described him as having a "caramel" complexion, light green eyes, dreadlocks below the shoulder, and wearing a white t-shirt.

¶ 6      Smith testified that he saw the driver fire a gun at him and the victim. He heard 10 shots and began running. After the shots stopped, Smith went back to the front of the building and saw that the victim had been injured. He subsequently learned that the victim died. Defense counsel did not cross-examine Smith.

¶ 7      Tonya Green testified that she dated the victim in 2013, and he was the father of their three-year-old daughter. Green stated that she also dated defendant prior to the shooting, and that she and defendant ended their relationship in July 2014, but they still had contact with each

other. Sometime before the shooting, defendant told Green he had a dispute with the victim at a convenience store and that he was going to kill her "baby daddy" the next time he saw him.

¶ 8      The day before the shooting, defendant picked Green up to give her a ride to Walmart in a black van that she had never seen before. He told Green it belonged to him. Green identified photos of the van in court.

¶ 9      Green testified that after the victim was killed on August 11, 2014, defendant called her, and she asked him why he would put her in this situation – her daughter's father getting killed. She testified that defendant told her she put herself in the situation and to "shut up."

¶ 10     Four days before she was scheduled to testify at trial, she was at home with her boyfriend when her boyfriend received a call from defendant, which he put on speaker phone. Green heard defendant state that her boyfriend should not let her come to court. A recording of that conversation was played for the court. Green testified that defendant stated, "Make sure that bitch don't leave out the crib," and "if you want to come to court and talk or if you want to talk on the phone like a gangster some folks are going to come down on your ass." Green testified that she considered the second statement to be a threat that caused her to fear for her life. Green also stated that during the phone call defendant told her to "fall back," which she understood to mean "don't come to court," and told her "your ass wouldn't make it another day in the world if you came to court." He also stated, "That bitch, she gonna die," and "I got something for her."

¶ 11     On cross-examination, Green stated that she told police she did not take defendant's threat to kill the victim seriously, and that she did not call the police when defendant threatened her during the telephone conversation.

¶ 12     The State also presented the testimony of Timothy McClinton, a friend of the victim who was in custody at the time of his testimony for contempt of court due to his failure to come to

3

court in the instant case to testify. On the night in question, a black Dodge Caravan approached where he was and stopped in front of the building where the victim was sitting. He testified that defendant started shooting out of the driver's side window. McClinton knew defendant from the neighborhood. He ran when he saw the victim had been shot because he had a warrant out for his arrest.

¶ 13    McClinton was arrested on his warrant on August 13, 2014. After his arrest, he spoke to detectives about the shooting and viewed a photo array that included a photo of defendant. While in jail, he saw defendant, who told him that he and the victim had an argument over a woman they were both dating and whether the baby was the victim's or defendant's baby. Defendant admitted to shooting at the victim.

¶ 14    Chicago Police Department evidence technician Steven Balcerzak testified that on the night in question, he responded to the crime scene and found an expended shell casing in the street.

¶ 15    Chicago police officer Mario Tapia testified that he responded to the scene on the night in question and found the victim laying on the sidewalk with gunshot wounds. Paramedics responded to the scene, and one paramedic handed him a bullet that had fallen off the victim's clothing. Officer Tapia testified that he followed the ambulance to the hospital, where a doctor recovered a bullet from the victim's body and gave it to Officer Tapia.

¶ 16    Abelardo Rodriguez, a Chicago Police Department evidence technician, testified that on August 13, 2014, he was assigned to go to 6936 South Morgan Street in Chicago. He arrived and found two police officers at a Mercury minivan that they wanted processed. Rodriguez recovered a 9-millimeter shell casing from inside the van that was on the floor between the front seats. The van had Indiana license plates. Defense counsel did not cross-examine Rodriguez.

¶ 17    Derius Moore testified that on the night in question he was at 7158 South Green Street in Chicago when a black van approached. He recognized the driver as defendant. He grew up in the same area as defendant. Moore testified that defendant started shooting towards him, the victim, and others. He heard 10 or 11 shots and started running.

¶ 18    Moore was arrested on November 21, 2014, for possession of a controlled substance. He spoke to police officers that day about the shooting of the victim. He testified that no threats or promises were made to him in exchange for the information he provided.

¶ 19    Gregory Brate, a forensic scientist for the Illinois State Police, testified as an expert in the areas of firearms and toolmark identification. He received the 9-millimeter fired cartridge from the black van. He also received the 9-millimeter fired cartridge casing recovered by the Chicago Police Department from the scene of the shooting. Brate testified that in his opinion, both were fired from the same firearm.

¶ 20    The State and the defense stipulated that Chicago Police Department officers Jawor and Bongivanni, if called to testify, would state that on August 13, 2014, they observed a 2001 Mercury Villager with Indiana license plates. The vehicle was reported stolen and suspected of involvement in a homicide. The officers curbed the vehicle and arrested defendant. They observed a shell casing on the center floorboard.

¶ 21    Following closing arguments, the trial court found defendant guilty of first degree murder and aggravated discharge of a firearm. The case was continued to January 17, 2018, for posttrial motions and sentencing.

¶ 22    On January 17, 2018, defense counsel Domin filed a motion for a new trial. The trial court also had a copy of defendant's presentence investigation report (PSI). On this same date, private counsel Daniel Stamm was given leave to file his appearance in the instant case. Stamm

told the trial court that defendant had asked him to represent him "in the posttrial matters as to the murder case that was already tried." Domin was given leave to withdraw from the case, and Stamm stated that he anticipated amending the motion for a new trial. The case was continued.

¶ 23    On February 28, 2018, Stamm stated that he had not yet filed an amended motion for a new trial because he had an appointment to copy the file and was trying to make sure he had the correct transcripts. Stamm also stated that "there was some discussion about the – if there are ineffectiveness of counsel claims, which [defendant] has raised with me, I haven't written them yet but those have been mentioned and I have to review and make sure that there might be some investigation time, perhaps not on our end but by the State ***."

¶ 24    On March 23, 2018, Stamm stated that he had not received all the trial transcripts. Stamm then filed an amended motion for a new trial on April 20, 2018. On the next hearing date, Stamm asked for a continuance to procure Moore's presence. Counsel told the court that he spoke to Moore, who had stated that he was recanting his trial testimony due to fear of retaliation. He told Stamm he was not present at the shooting, but the police told him he could get out of his own charges by identifying defendant as the shooter in defendant's case. The court denied the motion for a continuance and proceeded with the hearing on the motion for a new trial. Counsel raised several claims in the motion for a new trial, none relating to ineffective assistance of counsel.

¶ 25    The trial court denied the amended motion for a new trial and moved to a sentencing hearing. The trial court acknowledged that it had read defendant's PSI.

¶ 26    Defendant's PSI, which had been filed on January 17, 2018, contained a section entitled "Defendant's Version of the Offense," which stated in part:

> "My attorney failed to call Daryl Houston whose Grand Jury testimony
>
> would have impeached both of State's witnesses, Timothy McClinton and Derius

Moore. During his grand jury testimony Daryl Houston stated that he was hanging out outside the building with the victim and was trying to get a cigarette lit off a person who sat in a 2015 Impala. As the cigarette was being lit, he heard ten to fifteen shots in unknown directions. My attorney also did not contact another witness named Rel, who later made a statement to CPD, that he was never around. Derius Moore and Timothy McClinton testified that they were standing together and smoking and chilling with the victim, Rel, and Poppy (Daryl Houston). Tony Green visited me approximately one year before the trial and told me that she lied in her statement to the police because she was mad with me. I told my lawyer to subpoena the visitation video, but she never did that."

¶ 27     During mitigation, Stamm did not argue or claim ineffective assistance of defense counsel. He asked for the minimum sentence.

¶ 28     Defendant then made a statement. He stated in part:

"McClinton lied on the stand saying that I was on the deck with him playing cards and I told him – I told Miss Margaret to go subpoena the video surveillance, the video surveillance of me playing cards. And y'all she give me life in jail right now. She didn't do it. She failed to do it. *** I got a lawyer, Miss Margaret, ineffective. It's a lot of things she didn't do. She didn't call [unintelligible] to come testify to the statement because he would have impeached all of them for what they said. *** Your honor, I ask for the bare minimum because I fittin' to go down there and read. I don't know – I trying to help myself out. That's all I been doing because Miss Margaret, that lady is crazy. She had said threatening words but me believing that I am an innocent person, I didn't get that. But if I did

7

commit a murder and the things she said to me, I probably would did something

to Miss Margaret. But I'm not fittin' to pay Miss Margaret no attention. There is a

lot of things she didn't do. And I was in the midst of a speedy trial. I did not agree

to no delay. Miss Margaret – she tried to agree. She was ineffective. I been telling

Miss Margaret the whole time. She say all type of crazy stuff out of her mouth.

She told me she wasn't going to fight for me in my face and walked off – every

time she walked off."

¶ 29     The trial court did not respond to defendant's statement. The trial court sentenced

defendant to 45 years for first degree murder, in addition to 25 years for the firearm enhancement

regarding the first degree murder charge, for a total of 70 years. The trial court sentenced

defendant to 10 years for aggravated discharge of a firearm. The terms were to run

consecutively. Defendant now appeals.

¶ 30                                    II. ANALYSIS

¶ 31     On appeal, defendant contends that the trial court failed to conduct a preliminary inquiry

into defendant's *pro se* posttrial claim of ineffective assistance of counsel, as required by

*Krankel*. The State responds that there was no error on the part of the trial court, and that *Krankel*

is "irrelevant" here because he had already received all the relief he could possibly receive from

an initial *Krankel* proceeding, namely, the replacement of counsel. The State further contends

that even if the trial court erred by not conducting a preliminary inquiry, the error was harmless.

¶ 32     The issue of whether the circuit court properly conducted a preliminary *Krankel* inquiry

presents a legal question that we review *de novo*. *People v. Jolly*, 2014 IL 117142, ¶ 28.

Similarly, we review *de novo* the legal question of whether harmless error applies to errors

committed during a *Krankel* proceeding. *Id*.

¶ 33    In *Krankel*, the defendant's trial counsel failed to contact an alibi witness or present an alibi defense at trial. The defendant raised a *pro se* posttrial challenge to his attorney's competence at trial. The parties agreed that the trial court should have appointed counsel, other than his originally appointed counsel, to represent the defendant at the posttrial hearing regarding his claim of ineffective assistance. Our supreme court remanded the matter for a new hearing on the defendant's motion with newly appointed counsel. *Krankel*, 102 Ill. 2d at 187-89.

¶ 34    In interpreting *Krankel*, the following rule developed. New counsel is not automatically required in every case in which a defendant presents a *pro se* posttrial motion alleging ineffective assistance of counsel. *People v. Moore*, 207 Ill. 2d 68, 77 (2003). Rather, when a defendant presents a *pro se* posttrial motion alleging ineffective assistance of counsel, the trial court should first examine the factual basis of the defendant's claim. *Id*. at 77-78. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. *Id*. at 78. However, if the allegations show possible neglect of the case, new counsel should be appointed. *Id*. The new counsel would then represent the defendant at the hearing on the defendant's *pro se* claim of ineffective assistance. *Id*.

¶ 35    After reviewing the record in this case, it is evident that the proceedings below did not properly conform to the *Krankel* procedures. The record shows no examination whatsoever of the factual bases of defendant's *pro se* claims of ineffective assistance of counsel. "The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Id*. There was simply no inquiry in this case. Our supreme court has stated, "The law requires *** some type of inquiry into the underlying factual basis, if any, of the defendant's *pro se* posttrial claim of ineffective

assistance of counsel." *Id*. at 79. The trial court made no comment after defendant made his claims of ineffective assistance of counsel, and instead went on to conduct defendant's sentencing hearing. Accordingly, the trial court erred when it did not make a preliminary inquiry into defendant's *pro se* claim of ineffective assistance of counsel.

¶ 36    The State contends that the trial court had no duty to conduct a preliminary *Krankel* inquiry because defendant, by hiring a private attorney to represent him in posttrial proceedings, had already received all the relief he could possibly receive in an initial *Krankel* proceeding, namely, the appointment of new counsel. We disagree.

¶ 37    First, we note that if a defendant's *pro se* claim of ineffective assistance of counsel shows possible neglect on behalf of trial counsel, new counsel will be appointed to represent defendant at an adversarial hearing on the ineffective assistance claim. *People v. Munson*, 171 Ill. 2d 158, 199-200 (1996). The appointment of new counsel, of course, is to "independently evaluate the defendant's *pro se* allegations" and "present those with merit to the trial court during the second-stage adversarial hearing." *People v. Downs*, 2017 IL App (2d) 121156-C, ¶ 49. The fact that a defendant acquired private counsel to represent him in his posttrial motions does not relieve the trial court of its obligation to make a preliminary inquiry into a defendant's *pro se* claim of ineffective assistance of counsel.

¶ 38    We find support for this proposition in *People v. Reed*, 2018 IL App (1st) 160609. In that case, the defendant filed a *pro se* posttrial motion alleging ineffective assistance of counsel. *Id*. ¶ 30. Based on that motion, the trial court allowed trial counsel to withdraw at the next court appearance. New private defense counsel filed an amended motion for a new trial, arguing in part that the defendant "was denied ineffective assistance of counsel at trial." *Id*. ¶ 31. At the

hearing on the motion for a new trial, new defense counsel made no mention of the ineffective assistance of counsel claim. *Id.*

¶ 39    On appeal, this court found that the trial court did not conduct an examination of the factual bases of the defendant's *pro se* claims of ineffective assistance of counsel. *Id.* ¶ 51. Allowing counsel to withdraw and appointing new posttrial counsel "does not satisfy *Krankel* procedure." *Id.* We stated that "[e]ven after new counsel appeared, there is no indication in the record that any inquiry into defendant's ineffective assistance of counsel allegations occurred." *Id.* While new counsel "did eventually appear on defendant's behalf, there is no indication he was proceeding as *Krankel* counsel." *Id.* ¶ 52. Based on the record, the matter was remanded with instructions that "the trial court should engage in a preliminary inquiry as required by the case law." *Id.* ¶ 53. An adequate record would therefore be made of defendant's claims of ineffective assistance of counsel, and after a hearing, the trial court could determine whether the claims lacked merit or pertained to trial strategy. *Id.* If the claims had merit, the court would proceed to a second-stage adversarial hearing. *Id.* And if the defendant was unsuccessful at either stage, he could appeal if he so chose. *Id.*

¶ 40    Similarly here, while defendant retained new counsel for his posttrial proceedings, there is simply no indication from the record that he was proceeding as *Krankel* counsel. The trial court made no inquiry into defendant's allegations of ineffective assistance of counsel, and therefore there was no determination as to whether a second-stage *Krankel* hearing was necessary. If the trial court had found, after a preliminary inquiry, that his claim lacked merit or pertained to trial strategy, the court could have denied defendant's claim. If, however, the claim showed possible neglect on the part of trial counsel, new counsel would be "appointed to represent defendant at the second-stage hearing." *Id.* ¶ 49. Accordingly, simply appointing new

counsel does not afford the relief contemplated under *Krankel*. New counsel is expected to represent defendant at a hearing. As an aside, we find reason to believe that Stamm, defendant's new counsel, could not have adequately represented him in a *Krankel* hearing if the trial court deemed one was necessary. But a *Krankel* hearing never occurred.

¶ 41    Here, there was no inquiry into defendant's allegations, and thus no determination on whether a hearing was necessary. To find that defendant received all the relief he could under *Krankel* because he retained private counsel to represent him post trial is to ignore the essence of *Krankel* – which is to make an adequate record of defendant's ineffective assistance of counsel claims. That relief would still have been available to defendant in this case.

¶ 42    The State maintains, relying on *People v. Pecoraro*, 144 Ill. 2d 1 (1991), that *Reed* was wrongly decided. In *Pecoraro*, the defendant raised, both *pro se* and through newly retained defense counsel, claims of ineffective assistance of counsel in posttrial motions. *Id*. at 13. The trial court heard these motions and denied them, finding that "several issues raised by defendant, such as making trial objections and calling more witnesses, dealt with matters of defense strategy," and that other alleged errors by trial counsel did not establish incompetent representation. *Id*.  In fact, the court found that the defendant was "defended excellently" and given a "vigorous and intelligent defense" by trial counsel. *Id*. at 14. The trial judge "considered all arguments posed by defendant" and that the evidence showed that "defendant received competent representation." *Id*. *Pecoraro* is wholly inapposite to the case at bar where here, the trial court made no inquiry whatsoever into defendant's allegations of ineffective assistance of counsel.

¶ 43    Our supreme court in *Pecoraro* stated that the trial court was not required to conduct a *Krankel* inquiry into allegations of ineffective assistance of counsel directed at private counsel.

In so holding, the supreme court stated that the "defendant and his counsel were the only parties who could have altered their attorney-client relationship." *Id.* at 15. The court found that it had no authority to "advise or exercise any influence or control over the selection of [private] counsel," and that conducting a *Krankel* hearing would have done that. *Id.*

¶ 44    In the years since *Pecoraro*, the appellate court has reached conflicting conclusions about the scope of its apparent holding that the *Krankel* rule does not apply (or does not fully apply) to private counsel. See, *e.g.*, *People v. Shaw*, 351 Ill. App. 3d 1087, 1092 (2004) (*Krankel* does not apply to private counsel); *People v. Johnson*, 227 Ill. App. 3d 800, 810 (1992) (private counsel not automatically excluded from *Krankel* rule). The proper scope of *Pecoraro*'s holding aside, the case does not apply because defendant's ineffective assistance of counsel claims were directed at the public defender, not his privately retained counsel. See *People v. Downing*, 2019 IL App (1st) 170329, ¶ 68.

¶ 45    Based on this record, this matter must be remanded for a preliminary *Krankel* inquiry as required under the case law. *Moore*, 207 Ill. 2d at 79. In this way, an adequate record will be made of defendant's claims of ineffective assistance of counsel. If, after a hearing, the trial court determines the claims lack merit or pertain to trial strategy, it can deny the motion. If the claims are determined to have some merit, the court can proceed to a second-stage adversarial hearing, with Stamm as defendant's attorney. If defendant is unsuccessful at either stage, he can appeal if he chooses. *Krankel*, 102 Ill. 2d at 189.

¶ 46    The State contends that even if the trial court should have conducted a preliminary *Krankel* inquiry, its failure to do so constituted harmless error. While a trial court's failure to appoint new counsel to argue a defendant's *pro se* posttrial motion claiming ineffective assistance of counsel can be harmless error beyond a reasonable doubt (see *People v. Nitz*, 143

Ill. 2d 82, 135 (1991)), the failure to make any inquiry into a defendant's *pro se* allegation of ineffective assistance of counsel has not been found to be harmless error where no record at all was made on defendant's claims. See *Moore*, 207 Ill. 2d at 81. Here, as noted above, the trial court did not even acknowledge defendant's *pro se* claim of ineffective assistance of counsel, and therefore it is simply impossible for us to conclude that the trial court's failure to conduct an inquiry into defendant's claim was harmless beyond a reasonable doubt. *Id.* (No record was made on the defendant's claims of ineffective assistance of counsel and therefore it was not possible to conclude that the trial court's failure to conduct an inquiry into the allegations was harmless beyond a reasonable doubt.)

¶ 47    The State's reliance on *People v. Tolefree*, 2011 IL App (1st) 100689, does not convince us otherwise. In that case, the defendant argued on appeal that his trial counsel did not cross-examine an officer about whether the officer searched the defendant's car for drugs, or whether the defendant had a valid driver's license. *Id*. ¶ 28. The defendant argued that the case should be remanded because the trial court failed to question defendant or his counsel about the basis of his ineffective assistance of counsel claims, and thus failed to conduct an adequate *Krankel* inquiry. *Id*. On appeal, the court found that the trial court's failure to conduct further inquiry was harmless error because the trial court presided over the trial and observed and listened to the entire trial testimony, including defendant's testimony and the cross-examination of the officer in question. *Id*. ¶ 29. The court noted that "the substance of defendant's claim was found within the trial court record," and the ineffective assistance of counsel claim "did not indicate there was any substance beyond what was already in the trial record that would require a further inquiry under *Krankel*." *Id*. ¶ 39.

¶ 48    *Tolefree* is inapposite to the case at bar. While in *Tolefree* the defendant's allegations were all contained in the record and pertained to trial counsel's failure to cross-examine a witness on two issues, the allegations made by defendant in this case were not. Here, defendant alleged that a witness lied on the stand about whether he was playing cards with defendant in jail when defendant supposedly admitted to involvement in the shooting. Defendant also alleged that he asked defense counsel to subpoena the video surveillance of him that day, but she did not. He further stated that defense counsel failed to call a witness to testify who would have impeached other witnesses, and that defense counsel told defendant she would not fight for him. These allegations are not allegations that were already of record, and therefore the trial court's error in failing to make a preliminary *Krankel* inquiry was not harmless.

¶ 49    We reiterate that we are not remanding for a full evidentiary hearing on the issue of trial counsel's ineffectiveness. Rather, we remand the cause for the limited purpose of allowing the trial court to conduct the required preliminary inquiry. See *Moore,* 207 Ill. 2d at 81.

¶ 50                                III. CONCLUSION

¶ 51    For the foregoing reasons, we remand for the trial court to conduct a preliminary *Krankel* inquiry into defendant's allegations of ineffective assistance of trial counsel.

¶ 52    Remanded with directions.